## Sadler *et al. v.* Murrah.

The deposition of a notary public contained the following interrogatories: "1. Were you a notary public in the city of New Orleans, and acting as such during the month of January, 1837? 2. Did you, as such notary, protest the bill of exchange hereunto annexed? 3. Did you give notice of said protest, or that payment of said bill had been demanded, and refused, to the drawers? If yea, declare at what time and in what manner you gave such notice, to whom and what place were the notices directed; and state particularly whether said notices were forwarded in time to go out by the first mail that left on the day after the protest." *Held,* these were legal questions.

The act of the legislature of 1836, provides, that suit shall not be brought before the maturity of the bill on a protest for non-acceptance merely; repeals the damages on domestic bills, and reduces those on bills drawn here on a sister state to five per cent., giving ten per cent. on foreign bills. The act of May, 1837, provides, that no damages shall be allowed on bills drawn on a sister state, and gives five per cent. on domestic bills. A bill drawn after the act of 1836, and before that of 1837, is entitled to damages at the rate of five per cent.

ERROR to the circuit court of Hinds county.

This was an action of *assumpsit* by the defendants in error, upon a bill of exchange. On the trial in the circuit court, the plaintiffs, after reading to the jury the bill of exchange declared on, offered in evidence the deposition of H. B. Cenas, a notary public of New Orleans, at which place the bill was made payable, to prove presentment of the bill for payment, protest for non-payment and notice to the defendants; but it was objected to on the ground that it was an answer to leading and illegal interrogatories. The following are the questions which are said to be leading, and therefore objected to. 1. "Were you a notary public in the city of New Orleans, state of Louisiana, and acting as such during the month of January, 1837?" 2. "Did you, as such notary, protest the bill of exchange hereunto annexed? If yea, declare when and at what time the same was done." 3.

[Sadler *et al. v.* Murrah.]

" Did you give notice of said protest, or that payment of said bill had been demanded and refused, to the drawers? If yea, declare at what time, and in what manner you gave such notice; to whom and what place were the notices directed; and state particularly whether said notices were forwarded in time to go out by the first mail that left on the day after the protest." The court overruled the objection, and permitted the deposition to be read. There was a verdict for the plaintiffs below for the amount of the bill, with ten per cent. damages, but the plaintiff entered a *remittitur* for all the damages allowed beyond five per cent.

Hutchinson, for plaintiffs in error.

1. The admission of the deposition of the notary in answer to leading questions. This was plainly subversive of a fundamental rule of evidence that has been enforced from the very origin of jurisprudence, ever esteemed essential to the ascertainment of truth from the knowledge of witnesses, and never relaxed except in instances of obvious necessity, to reach the truth. The rule is that, on the examination of a witness in chief, leading questions, such as indicate the answers, are not to be put. If it suggest the desired answer, or if the answer in the affirmative or negative would be conclusive as to the matter of interrogation, the question is illegal, and the answer consequently inadmissible. Even on cross examination, where the question points to new matter, it is inhibited. It is held to be of the last importance to enforce this rule, when the witness may be considered ready to serve the cause of his interrogator, and willing to adopt his suggestions. 1 Starkie's Ev. 123; Lessee of Snyder *v.* Snyder, 6 Bin. 483; Harrison *v.* Rowan, 3 Wash. C. C. Rep. 580.

Direct questions are allowed to identify persons or papers, or to introduce or indicate a particular subject as the matter to be ascertained, so as to distinguish it from other matters, though not to reach that matter in its nature or details; and where the witness appears ignorant and vulgar, and otherwise the relevant truth cannot be extracted, the court has permitted him to tell the story in his own way, reserving the right and exerting the duty of sifting the wheat from the chaff. So too, if the court should think the witness inclined towards the adverse party, or disposed

[Sadler *et al. v.* Murrah.]

to suppress and conceal, it will allow a more direct interrogation. But these two last exceptions can only be applicable to examinations in court.    1 Starkie's Ev. 124; Nickols *v.* Dowling, 1 Starkie's N. P. C. 81; Courteau *v.* Touse, 1 Campb. 43.

Here is interrogated a notary, whose chief, perhaps sole pursuit, is the protest of negotiable paper in a large commercial emporium; whose living may depend on his accurate operations, who is liable to holders of paper entrusted to his agency for neglects and blunders, and on whom the heaviest bias rests to repair them.   He is human; and as a fallible being, if capable of being swerved, all the circumstances bearing upon him must incline him toward the creditor.   From necessity, however, his evidence must be in general admitted; but still there is no other supposable case, in which a witness that is competent, should be more rigidly put under the strict rule.   We need not suppose, for we know from experience, that in general the notary is ready to serve the cause of his principal, and willing, if possible, to adopt his suggestions to save the money.   No crimination ought to be indulged or even imagined against a class of men, or one of that class, without actual grounds.   It is enough to assert, what is quite apparent, that a notary is in a delicate predicament, and that, in regard of human frailty, a temptation that may be avoided, ought not to be added to those unavoidably surrounding him.   Let him be directed to inspect the bill, or a copy, and asked what was his action upon it, if any, but nothing more particular.   Let him not be asked directly, as here in detail, every iota requisite to charge the drawers.   Were you a notary in New Orleans in January, 1837?   Yes.   Did you present and protest the bill?   Yea, verily I did.   Did you give notice to the drawers that payment was demanded and refused?   Indeed I did most promptly.   Were the notices mailed in time to go out by the first mail that left the city after the protest?   Yes, my dear friend and patron, I was too skilful a notary, too wide awake and too unerringly at my post, to omit that important matter.   If these be not leading questions within the inhibitory sense and letter of the rule, no conceivable question can be.   It is insisted, that on this score, the judgment must be reversed, or an ancient continued salutary rule of the common law abrogated.

17*

[Sadler *et al. v.* Murrah.]

2. Ten per centum damages of protest were allowed by the court below, and included in the verdict. This, too, was error. The bill was drawn subsequent to the act of February 27, 1836, p. 118. That act provides that suit should not be sustained on a protest for non-acceptance, until the bill matured; denied damages on domestic bills, reduced damages on bills drawn here on a sister state, to five per cent. and to ten on foreign bills; and in its terms embraced bills drawn and to be drawn. The act of May 11th, 1837, p. 175, provides that no damages should be allowed for default made on any bill drawn here on a sister state, and gave five per cent. on domestic bills. Both acts are in their terms as directly retrospective as language could render them. The former affects the remedy on bills protested for non-acceptance, as well those in suit as those to be put in suit; and both regulated the future action of the courts in the allowance or refusal of damages at trial on bills drawn or to be drawn. Were those laws, especially was the last, constitutional in its whole scope and function? If it was, then, in any view that can be taken, whether on the record ten or five per cent. damages of protest be allowed to the creditor, the judgment must be reversed. Story's chapter upon the prohibition in the legislation of the states against impairing the obligations of contracts, 3 Story's Com. on Constitution, 240 to 269, presents a condensed but able review of the settled doctrines on that clause of the constitution. The clause is only repeated in the state constitution. The obligations created by this bill, were the civil duties the parties imposed on themselves, and whose performance the natural law sanctioned and the municipal law was ready to enforce; the duty of the acceptor to pay absolutely, and of the drawers to pay conditionally the sum named. Those were the obligations protected by the constitution from legislative infraction. There was no obligation not to perform. The legislation in question does not enlarge or diminish the obligation. It leaves that perfectly inviolate. It attaches or withholds a mere incident, concerning which the parties did not stipulate, and which could alone be given or denied as a consequence upon a violation of the obligation.

Does the *lex loci contractus* form part of it, and wander and migrate with it, from Calcutta to the Levant—from the cliffs of

[Sadler *et al. v.* Murrah.]

Albion to the valley of the Father of Waters? The Supreme Court of the Union have held in the great case of Ogden *v.* Saunders, that, though the law of the place acts on the contract, governing its construction, validity, and obligation, it constitutes no ,part of it. The legislature is left free to alter or repeal many provisions that do affect the contract in its whole course—only it may not affect the terms and scope of the contract, the obligations that arose upon it, coevally with the making of it—and so that a remedy for a breach be not denied. Thus, the nature and extent of the remedy may be varied; the particular form changed; the limitation of the action either narrowed, or enlarged, or abrogated; the rules for the benefit of insolvent debtors materially altered; and the imprisonment of the debtor abolished. The prohibition of laws, *ex post facto*, has been held to relate exclusively to matters pertaining to the criminal code; and that there may be many laws acting *civiliter*, that are retrospective in their character, and yet not in conflict with constitutional protection afforded to the obligation of contracts; and such laws, though they may often be unsound on general principles, are to be enforced.

Thus far, we are sustained by the book cited. To deny or give damages of protest, is not to enlarge or impair the obligations of a bill of exchange. The question then is, can those damages be given or denied retrospectively by the legislature? That sort of paper has constituted a large portion of our circulating medium. Damages are annexed as an incident to the breach of the contract, or withheld by the legislature, as considerations of expediency in view of the common weal may prompt; and may not damages be regarded as a legitimate sort of bonus to swell that branch of circulation, by insuring good faith and promptness in the honor of the paper, or as a forfeiture for the dishonor of it?

Suppose that, at the drawing of this bill, no such equivalent of re-exchange had been allowed—and that after acceptance, and before maturity, ten per cent. had been allowed—would this iota have formed a portion of the contract? Could it be said in truth, that the parties in contracting, looked to it? And yet if the law remained until verdict, might not the holder claim its benefit? Let the principle work both ways. If the legislature may give

[Sadler *et al. v.* Murrah.]

such an incident, bonus or forfeiture, let it be taken away by the same power, according to its appreciation of the true interests of the country, under successive commercial mutations and other vicissitudes. It is sufficient that the contracting parties stipulated concerning the payment of a specified sum—and that their contract, and the law governing its construction, validity, and obligation at the time it was made, remain alike unimpaired. The laws, regulating the matter of damages of protest, fix on the time of trial for the " allowance." If at that time none are allowed, none are to be given.

It was, doubtless, the intention of the judge below, to let one half of the damages of protest that had been allowed to be remitted, so as to bring the recovery under cover of the act of 1836; and, at the same, to repudiate the act of 1837 as retrospective, and therefore, unconstitutional. This may have been *intended,* but it is not so nominated on the record. The judge certifies in the bill of exceptions, that the plaintiff below remitted *five per cent. of the recovery.* Now, five per cent. of the recovery or judgment, is quite a different matter, as well as amount, from five per cent. damages of protest: it may have been in consequence of some payment. The record must be the criterion; and by *that, no portion of the damages of protest was remitted.*

Nevertheless, if there had been such remission, still five per cent. damages, on this as a foreign bill, was included in the judgment, which was prohibited by the act of 1837, which, in all its terms and bearings, was the law of the trial.

Tarpley, for the defendant in error.

In reference to the first assignment of error, it will be found, that no leading question was asked by the witness. His mind was directed to a particular point, and then the question intended to draw out the necessary evidence was put in a strictly legal form. This point is so familiar in every day's practice, that I cannot think of referring to authority to prove what was never denied before. Upon the second assignment of error, the act of 1822, fixed the damages upon protested bills of exchange, at ten per cent.; but by the act of 27th July, 1836, the damages were reduced to five per cent., upon all bills drawn, or to be drawn

[Sadler *et al. v.* Murrah.]

upon any person resident in the United States. It is admitted, that there was error in allowing ten per cent. damages on this bill dated in March, 1836, but this error was cured by remitting five per cent. of the damages in the court below. There was no error in the case at the time that the bill of exceptions was taken, for the error complained of had been rectified. That the party had the right, nay, that it was his duty, to remit the excessive damages is obvious; and that while the courts exercise a sound discretion in granting new trials for the promotion of justice, they will always refuse to do so if justice has been done, is a well-settled principle. When new trials are asked in consequence of excessive damages, they will always be refused, provided the plaintiff will remit a sufficient amount of the damages, to reduce them to the standard of justice, and this is left to the discretion of the court to be established from the facts proved at the trial. But much more may it be done, when the law has fixed the standard at a certain point, and the damages are made to correspond with that standard. Suppose that five per cent. only had been added in the verdict of the jury as damages, it would surely have been legal, and left the plaintiffs in error without any ground of complaint. By remitting the damages, he stands precisely in the same condition, as though but five per cent. had originally been given, and the plainest dictates of reason and common sense forbid the idea of reversing a judgment and sending down a case to *nisi prius*, to be tried *de novo*, when the parties now stand precisely in the same condition as they would do after a verdict of five per cent. damages, which it must be admitted, would be correct.

Upon the fourth assignment, the act of 1836 is conclusive, and five per cent. is there established as the rate of damages on protested bills.

As to the fifth assignment, the rule of the court not having been complied with in presenting the proper calculations, &c., it will be unnecessary to notice it further.

The judgment of the court below, should therefore be affirmed with damages.

Mr. Justice TROTTER delivered the opinion of the court.

Two errors have been assigned:—1. The admission of the

[Sadler *et al. v.* Murrah.]

deposition of the notary in answer to the questions above speci-
fied.   2.  The allowance of damages on the protest.

In regard to the first assignment of error, it may be remarked,
that it is not very easy to lay down any precise rule on the sub-
ject.   On the one hand, it is clear that the mind of the witness
must be brought into contact with the subject of inquiry; and on
the other he ought not to be prompted to give a particular answer,
or be asked a question, the obvious answer to which would be
yes or no.   But how far it may be necessary to particularise in
framing the question, must depend upon the circumstances of each
particular case.   In a case before Lord Ellenborough, where it
became necessary to identify one of the parties to a conspiracy,
he permitted the prosecutor to point to the person, and ask the
witness whether he was the man.   So, where a witness is called
to prove the handwriting of another, it is the common practice to
show him the document, and ask him whether that is the hand-
writing of the party.   1 Starkie on Ev. 124.   Objections of this
sort should not be wantonly or captiously made, since it is to
some extent always necessary to lead the mind of the witness.
The objection chiefly becomes important when any conversation,
admission, or agreement, is attempted to be proved, and where
there may be danger, unless great caution is used, that an im-
proper coloring may be given to the subject, by an artful structure
of the questions.

In view of these well-settled rules, we do not feel authorised
to pronounce the questions put to the notary in this case, to be
leading questions within the meaning of the law.   It is difficult
to conceive how the mind of the witness could have been well
directed to the several subjects of inquiry proposed, in any less
objectionable mode than that adopted.   It was desirable to know
whether he held the office of notary in New Orleans, in January,
1837; and he is therefore asked to state whether he did.   Can it
be seriously insisted, that the reasons against leading questions,
apply to a subject of inquiry, of the character of this?   What
danger was there that the witness might be led astray on that
subject?   The fact to which his attention was directed, was of
public notoriety, and the only tendency of the interrogatory was
to bring it to his attention, that the plaintiff should have the

[Sadler *et al. v.* Murrah.]

benefit of his answer, which could not possibly be controlled by the shape of the inquiry. It is desirable to know whether he protested the bill of exchange as notary, and he is next asked if he did so, and when? To this interrogatory, there can be no objection. The third question is, whether he gave the requisite notices of the protest, and he is asked when they were given, in what mode, and to whom? There can be no objection to this mode of inquiry, and we are not able to perceive in what other mode the interrogatory could have been framed. The only ground upon which a plausible objection can be raised, is the latter branch of the third interrogatory, where the witness is required to state particularly, whether the notices were mailed in time to leave by the first mail which left after the protest. But we think that; when taken in connection with the other members of the question, it is not so defective as to authorise the exclusion of the deposition.

As to the question of damages, which were allowed at the rate of five per cent. upon the protest, we are satisfied, that the objection which has been taken to the judgment on that ground, cannot prevail. The bill of exchange in this case was drawn subsequent to the act of 1836. That act provides, that suit shall not be brought before the maturity of the bill, on a protest for non-acceptance merely; allows no damages on domestic bills, and reduces those on bills drawn here on a sister state to five per cent., giving ten per cent. on foreign bills. The act of May, 1837, provides, that no damages shall be allowed on bills drawn on a sister state, and gives five per cent. on domestic bills. Both acts embrace bills drawn, and to be drawn; and it is contended, that in respect to the damages, they were effectually disallowed on this bill by the last-mentioned act, although the bill had been drawn and protested before the passage of it. But we cannot persuade ourselves, that it could have been the design of the legislature to give to the act that operation. To do so, would most clearly be unconstitutional. The act of 1836, which allowed five per cent. on bills drawn on another state, was in full force at the time of the drawing this bill, and at the date of the protest. The holder under that law, had an undoubted right in action to the damages which were given by it, as much so, as

[Sadler *et al. v.* Murrah.]

he had to the legal rate of interest; and it was not in the power of the legislature to divest that right.

The judgment must, therefore, be affirmed with damages and costs.